09 CV 9841

HILL, BETTS & NASH LLP
Mark M. Jaffe
James D. Kleiner
Kenneth F. McGinis
Attorneys for Plaintiff
*Crimson Marine Company*
One World Financial Center
200 Liberty Street, 26th Floor
New York, New York 10281
Tel:    (212) 839-7000
Fax:    (212) 466-0514



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

CRIMSON MARINE COMPANY,                 :
                                        :
                            Plaintiff,  :        09 Civ. _____
                                        :
        - against -                     :        **VERIFIED**
                                        :        **COMPLAINT**
KOREA LINE CORPORATION                  :
                                        :
                            Defendant.  :
-------------------------------------------------------------x

Plaintiff, CRIMSON MARINE COMPANY ("Plaintiff"), by and through its attorneys,

Hill, Betts & Nash LLP, as and for its Verified Complaint against the defendant KOREA

LINE CORPORATION ("KLC"), alleges as follows:

### Nature of this Action

1.      In this action Plaintiff seeks an *ex parte* order of attachment in aid of

arbitration under New York Civil Practice Law and Rules ("CPLR"); Section 7502(c) and

Rule 64 of the Federal Rules of Civil Procedure.

### Jurisdiction

2.      This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a

maritime contract for the charter of a ship, seeking charter hire and/or other relief. This case thus falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333.

3.      Further or alternatively, the Court has jurisdiction pursuant to 28 USC §1332 as the matter in controversy exceeds $75,000 and involves citizens of different foreign states.

4.      The Court also has federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

## The Parties

5.      At all times material to this action, plaintiff was and still is a Marshall Islands corporation.

6.      At all times material to this action defendant KLC was and still is a South Korean corporation which has registered to do business in New York State and has appointed as its agent for service of process C T Corporation, 111 Eighth Avenue, New York N.Y. 10011.

## First Claim for Charter Hire

7.      On or about February 29, 2008, plaintiff and defendant entered into a contract of time charter party (the "Charter Party"). Pursuant to the Charter Party, plaintiff, as owner of M/V GEORGIANA (the "Vessel"), agreed to let and KLC, as Charterer, agreed to hire the Vessel for the period stated therein of a minimum 35

2

months, maximum 38 months; and KLC agreed to pay for the use and hire of the Vessel. A copy of the Charter Party is attached as Exhibit 1.

8.    KLC at all material times herein was and is presently in default of its obligation to pay hire owed to plaintiff under the Charter Party.

9.    Payment of hire in the amount of $39,000.00 per day to plaintiff, under the Charter Party, was required to be made by KLC 30 days in advance, totaling $1,140,750.00 for every such 30 day charter period (a "Charter Period").

10.    KLC effected the first and second payments promptly and in accordance with the terms of the Charter Party.

11.    KLC unilaterally and in breach of its obligations under the Charter Party, made the hire payment due December 30, 2008 in two installments: on January 6, 2009, January 21, 2009.

12.    KLC unilaterally and in breach of its obligations under the Charter Party made the hire payment due January 29, 2009 in two installments: on February 3, 2009 and February 16, 2009.

13.    KLC unilaterally and in breach of its obligations under the Charter Party made the hire payment due February 28, 2009 in two installments: on March 9, 2009 and March 18, 2009.  These payments were deficient in the amount of $25,243.50.

14.    KLC unilaterally and in breach of its obligation under the Charter Party paid the hire payment due March 30, 2009 in two installments: on April 8, 2009 and April 28, 2009, and the total hire paid was deficient in the amount of $34,101.80.

15.    KLC was duly notified by the Plaintiff that such deficient, late and partial payments were not permitted by the Charter Party, and that no amendment or

3

modification to the Charter Party, or waiver thereof, providing for same was ever agreed to by the Plaintiff.

16.     Commencing with the hire payment due April 29, 2009, KLC unilaterally and in breach of its obligations under the Charter Party reduced the daily rate which it paid for the charter of the Vessel from the Charter Party hire rate of $39,000.00 to $26,000.00, which represents a shortfall of $13,000.00 per day or $390,000 per Charter Period.

17.     KLC unilaterally and in breach of its obligations under the Charter Party paid the hire payment due April 29, 2009 in three installments: on May 14, 2009, May 19, 2009 and June 17, 2009 and the total hire paid was deficient in the amount of $390,000.00.

18.     Upon such deficient hire-payments, Plaintiff informed KLC that it did not agree to any amendments, modifications or waiver of the Charter Party, and that it reserved all rights in respect to KLC's breach of their obligations under the Charter party.

19.     For the hire-payments due May 29, 2009 through November 25, KLC continued to make hire payments to Plaintiff in two installments after the due dates and in amounts which represented daily hire of the Vessel in the amount of $26,000.00 per day, in breach of its obligation under the Charter Party to pay a daily hire of $39,000.00.

20.     KLC has not denied that there is presently owing and due from it to plaintiff under the Charter Party hire in the sum of $3,516,405.19 and has stated no defense to its failure to pay full hire.

21.     The Plaintiff has made, and continues to make protests to KLC and has demanded that all shortfalls be remitted immediately.  Through November 25, such

shortfalls total $3,516,405.19, as set out in Appendix A, and this amount remains due and outstanding to plaintiff under the Charter Party.

22.     KLC has informed plaintiff that due to its financial difficulties it cannot and will not be able to pay the full amount of hire as and when it falls due under the Charter Party.

23.     As a result of KLC's continuing breach, Plaintiff's damages will continue to accrue at the minimum rate of $390,000 per Charter Period and on the basis that KLC will persist to under-pay hire for the entire remainder of the charter party, the minimum term of which is 35 months, plaintiff believes it will suffer additional damages estimated at $8,190,000.00.

24.     Clause 17 of the Charter Party provides for arbitration in London.

25.     The Charter Party is governed by English law, under which interest, costs and attorneys' fees are routinely awarded to prevailing party in litigation and or arbitration.  As best as can now be estimated, plaintiff will be entitled to recover the following amounts under the Charter Party:

| | |
|---|---|
| Principal claim for hire past due[1] | $ 3,516,405.19 |
| Claim for losses through term of Charter Party | $ 8,190,000.00. |
| Simple interest on $11,706,405.19 at 6% for a period of 2 years | $ 1,404,768.60 |
| Arbitration costs and attorneys' fees: | $    200,000.00 |
| Total: | $13,311,173.79 |

---

[1] Plaintiff reserves the right to amend this complaint to claim additional damages that may accrue.  Any and all of plaintiff's claims are reserved, as are plaintiff's rights under any arbitration or forum selection provision that may be applicable for suit against defendant.

## ATTACHMENT IN AID OF ARBITRATION
## PURSUANT TO ARTICLE 7502(c) OF NEW YORK CPLR

26.     Plaintiff realleges paragraphs 1 through 25, as if set forth in full herein.

27.     Plaintiff seeks an *ex parte* order of attachment in aid of arbitration, under New York's CPLR Section. 7502(c) and Rule 64 of the Federal Rules of Civil Procedure.

28.     New York's CPLR Art. 7502(c) provides for attachment in aid of *foreign* arbitrations that are covered by the New York Convention on the Enforcement and Recognition of Foreign Arbitral Awards ("New York Convention"), such as the London arbitration provided for in the parties' contracts herein.

29.     Article 7502(c) provides for attachment "on the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."

30.     Article 7502(c) further provides that the provisions of Article 62, CPLR's attachment provisions, shall apply to the application "except that the *sole* ground for granting of the remedy shall be as stated above that the award may be rendered ineffectual," (Emphasis added.)

31.     The documents annexed hereto and Defendant's clear and repeated breaches of Contract amply demonstrate the existence of a valid cause of action and the likelihood of success on the merits of plaintiff's claims in the London arbitration.

32.     A review of Federal Court records reveals that KLC is or has been named as defendant in numerous actions in the past eighteen months in which it is alleged that KLC failed or was unable to meet its contractual payment obligations. The above does not include actions in foreign jurisdictions for similar claims.

33.    On or about January 22, 2009, KLC registered with the New York
Department of State as a foreign corporation and appointed an agent for the service of
process in this district.  KLC's registration to do business in New York was directed to
insulating itself from further Supplemental Rule B attachments solely for placing KLC's
assets, namely dollar transfers, beyond the reach of its creditors including Plaintiff
demonstrating that KLC is endeavoring to avoid honoring any award that might be
entered in the London arbitration.

34.    In light of KLC's clear disregard of its Charter Party obligations, and its
own admission that it is in financial difficulties and the evidence of multiple claims that
have been asserted against it, there is a risk that any arbitration award may be rendered
ineffectual without the attachment of KLC's property while it is still within the
jurisdiction.

35.    Based on the foregoing, any arbitration award to which Plaintiff might be
entitled may be rendered ineffectual within the meaning and purpose of CPLR
Art. 7502(c).

36.    Plaintiff knows of no counterclaim and upon information and belief the
Plaintiff's claim herein is in excess of any counterclaim.

WHEREFORE, CRIMSON MARINE COMPANY prays:

a.    That process in due form of law pursuant to Rule 64 of the Federal Rules
        of Civil Procedure and Article 7502(e) of New York's Civil Practice Law
        and Rules, according to the practice of this Court in admiralty and
        maritime jurisdiction issue against the defendant KOREA LINE
        CORPORATION citing defendant to appear and answer under oath all and

7

singular the matters alleged, failing which a default will be taken against it;

b.    That pursuant to said Rule 64 of the Federal Rule of Civil Procedure and CPLR Art. 7502(c), an *ex parte* order of attachment be issued in the accompanying form, directing that all tangible and intangible property of said defendant up to and including the sum of $13,311,173.79 may be restrained and attached wherever found, including, in the hands of any garnishee(s) upon whom a copy of the Order Attachment may be served;

c.    That this Court retain jurisdiction over this matter for purposes of any subsequent motions to confirm the attachment, to confirm the arbitration award or as an enforcement action, as may be necessary; and

d.    For such other, further and different relief as this Court may deem just and proper.

Dated: New York, New York
November 30, 2009

HILL, BETTS & NASH/LLP

By:

Mark M. Jaffe (MJ-4855)
James D. Kleiner (JK-6303)
Kenneth F. McGinis (KM-9664)
Attorneys for Plaintiff
*Crimson Marine Company*
One World Financial Center
200 Liberty Street, 26th Floor
New York, NY 10281
(212) 839-7000

## ATTORNEY VERIFICATION

STATE OF NEW YORK   )
                         : ss.:
COUNTY OF NEW YORK  )

JAMES D. KLEINER, being duly sworn, deposes and says as follows:

1.      I am a partner in the firm of Hill, Betts & Nash LLP, attorneys for Plaintiff in this action, I have read the foregoing Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

By: _____
James D. Kleiner

Sworn to before me this
30th day of November 2009

_____
Notary Public

JANET M. WALTERS
NOTARY PUBLIC, State of New York
No. 01WA6060664
Qualified in Kings County
Commission Expires 7 - 2 - 11

NY098478.2

# APPENDIX A

**APPENDIX A**

The amount and due date of each hire payment against the receipt of each payment, as of November 29, 2009, is as follows:

| Payment ARREARS (Charter Period) | DUE DATE | SUM DUE | SUM PAID | DATE PAID | SUM IN ARREARS |
|---|---|---|---|---|---|
| 1st payment (31/10/08 - 30/11/08) | 31/10/08 | $1,448,105.52 | $1,272,587.52 | 04/11/08 | ($51.00) |
| | | | $175,467.00 | 06/11/08 | |
| 2nd payment (30/11/08 - 30/12/08) | 30/11/08 | $966,518.88 | $966,485.88 | 01/12/08 | ($33.00) |
| 3rd payment (30/12/08 - 29/01/09) | 30/12/08 | $1,152,449.88 | $293,083.44 | 06/01/09 | ($288,408.00) |
| | | | $570,958.44 | 21/01/09 | |
| 4th payment (29/01/09 - 28/02/09) | 29/01/09 | $1,142,048.88 | $848,833.44 | 03/02/09 | $277,743.00 |
| | | | $570,958.44 | 16/02/09 | |
| 5th payment (28/02/09 - 30/03/09) | 28/02/09 | $1,152,581.88 | $563,692.44 | 09/03/09 | ($25,243.50) |
| | | | $563,645.94 | 18/03/09 | |
| 6th payment (30/03/09 - 29/04/09) | 30/03/09 | $1,161,393.68 | $563,645.94 | 08/04/09 | ($34,101.80) |
| | | | $563,645.94 | 28/04/09 | |
| 7th payment (29/04/09 - 29/05/09) | 29/04/09 | $1,141,982.88 | $295,117.94 | 14/05/09 | ($386,811.50) |
| | | | $286,803.44 | 19/05/09 | |
| | | | $173,250.00 | 17/06/09* | |
| 8th payment (29/05/09 - 28/06/09) | 29/05/09 | $1,141,982.88 | $383,177.19 | 02/06/09 | ($382,832.25) |
| | | | $375,973.44 | 17/06/09* | |
| 9th payment (28/06/09 - 28/07/09) | 28/06/09 | $1,141,982.88 | $375,973.44 | 30/06/09 | ($390,051.00) |
| | | | $375,958.44 | 16/07/09 | |
| 10th payment (28/07/09 - 27/08/09) | 28/07/09 | $1,141,982.88 | $375,958.44 | 31/07/09 | ($390,056.50) |
| | | | $375,967.94 | 14/08/09 | |
| 11th payment (27/08/09 - 26/09/09) | 27/08/09 | $1,141,982.88 | $375,958.44 | 28/08/09 | ($390,056.50) |
| | | | $375,967.94 | 11/09/09 | |
| 12th payment (26/09/09 - 26/10/09) | 26/09/09 | $1,141,982.88 | $375,973.44 | 29/09/09 | ($390,036.00) |
| | | | $375,973.44 | 15/10/09 | |
| 13th payment (26/10/09 - 25/11/09) | 26/10/09 | $1,141,982.88 | $375,958.44 | 30/10/09 | ($373,801.00) |
| | | | $392,223.44 | 16/11/09 | |
| 14th payment (25/11/09 - 25/12/09) | 25/11/09 | $1,141,982.88 | $399,316.74 | 26/11/09 | ($742,666.14) |
| Total | | $16,158,961.76 | $12,642,556.57 | | ($3,516,405.19) |

# EXHIBIT 1

# ORIGINAL

## TIME CHARTER
### GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1 This Charter Party, made and concluded in Copenhagen, 29ᵗʰ February, 2008

2 Between *Crimson Marine Company, Majuro, Marshall Islands*

3 Owners of the good .......... Steamship/Motorship "**GEORGIANA**" - *Vessel's description as per clause 29.*

4 of .......... ~~tons gross register; and~~ .......... ~~tons net register, having engines of~~ .......... ~~indicated horse power~~

5 ~~.......... ~~

6 ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~

7 ~~..........~~ ~~cubic feet bale capacity and stores not exceeding~~

8 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding~~

9 ~~showing a minimum of fifty tons) on a draft of .......... feet on~~

10 ~~which are of the capacity of about~~ .......... ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

11 ~~conditions about~~ .......... ~~knots on a consumption of about~~

12 now *under construction* .......... ~~tons of fuel—Welsh coal best grade—fuel oil, best grade, Diesel oil.~~

13 .......... and *Korea Line Corporation*

14 Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15 *A time-charter period of minimum 35 (thirtyfive) to max 38 (thirtyeight) months, exact period in Charterer's option, trading world wide via safe*

16 *berth(s), safe anchorage(s), safe port(s), always afloat, always within Institute Warranty Limits and NAABSA as per clause 6*

17 .......... within below mentioned trading limits.

18 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

19 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers at *when/where ready Chengxi Shipyard, PRC*

19 *Laycan 1ˢᵗ October / 20ᵗʰ December, 2008 to be narrowed. Owners will declare 12 days laycan spread latest 20 days prior to delivery. Owners to*

20 *give 60/30/20/15/10 days approximate and 7/5/3/2/1 days definite notice of delivery to Charterers.*

20 ~~in the~~ ~~Charterers may, upon~~ .......... ~~dock, wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6) or so~~

21 ~~near thereto as she may safely get and lie, always afloat, and there deliver her. time to be provided for in clause No.5. Vessel to be clean on arrival~~

22 ~~at first loading port for Charterers' intended cargo. on her delivery~~

23 ~~the vessel to be~~

24 ~~ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and~~

25 ~~derricks with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

26 ~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-~~

27 ~~dise, including petroleum or its products, in proper containers, excluding See Clause 46.~~

28 ~~(vessel not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk~~

29 ~~all necessary fittings and other equipment to be supplied by Charterers), between safe port and/or ports in British North~~

30 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

31 ~~Mexico, and/or South America, and/or Europe~~

32 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand,—but excluding Magdalena River, River St. Lawrence between~~

33 ~~October 31ˢᵗ and May 15ᵗʰ, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.~~

*For worldwide trading via safe port(s) safe berth(s), safe anchorage(s) always afloat, except NAABSA in Argentina, Brazil and River Plate as per clause 6 to be allowed.*

See also Clause 58 for trading exclusions. ..........



34    as the Charterers or their Agents shall direct, on the following conditions:
35    1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew, shall pay for the
36    insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, and fresh water and maintain
37    her class, and keep

38    the vessel in a thoroughly efficient state in hull, machinery and equipment *with documentation relating to the vessel that may be required to permit the*
       *vessel to trade within the agreed trade limits, including International Tonnage Certificate, Suez and Panama Tonnage Certificates, Certificate of*
       *Registry and Certificates relating to the strength, stability, including grain certificates. The Charterers to advise Owners in advance of special*
       *Certificates required other than usual trading Certificates* for and during the service

39    2. That, *whilst on hire,* the Charterers shall, provide and pay for all the fuel *and IMO,* except as otherwise agreed, Port *and canals/straits* Charges,
       *canal and river tolls and/or compulsory and/or customary Pilotages, Agencies, Commissions,*

40    Consular Charges (except those pertaining to the Crew *and flag of the vessel),* and all other usual expenses except those before stated, but
       when the vessel puts into

41    a port for causes for which *Owners are vessel is* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered
       because of

42    illness of the crew to be for Owners' account. Fumigations ordered because of cargos carried or ports visited while vessel is employed under this
43    charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44    of six months or more.
45    Charterers are to provide *and remove at their time and costs* necessary dunnage and shifting boards, also any extra fittings requisite for a
       special trade or unusual cargo, but

46    Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47    for dunnage, they making good any damage thereto.
48    3. *See Clause 37. That the Charterers, at the port of delivery, and the Owners at the port of redelivery, shall take over and pay for all fuel*
       *remaining on*

49    *Board the vessel at the current price in the respective ports, the vessel to be delivered with not less than* ................... *tons and not more*
       *than*

.................. *tons and not less than* ........................ *tons of fuel on board.* ................... *tons and not more than* ................... *tons.*

50    .......... ...... ............. ...... .................... ...... .......... ............... ........ United States Currency per ton on delivery and redelivery.
51    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 44*
52    ................. ................. ........ Currency, *per Calendar Month,* commencing on and from the day *and hour* of her delivery, as aforesaid, and at
53    ........ .... ......... ............... *summer freeboard, per Calendar Month,* commencing on and from the day *and hour* of her delivery, as aforesaid, and at
54    and after the same rate for any part of *a day month;* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55    wear and tear excepted, to the Owners (unless lost) at *see clause 69*
56    unless otherwise mutually agreed. Charterers are to give Owners not less than *see clause 40*
57    *notice of vessel's expected date and probable port of redelivery.*
58    Payment of said hire to be made in ... ...*days clause 41 in New York* in cash in United States Currency, *30 days* semi-monthly in advance and for the
       last *30 days half month* or

59    part of same the approximate amount of hire, *and should same occur the stated time, hire is to be paid for the balance day by day, as it becomes*
       *due,* ...*if so required by Owners, whose bank guarantee or deposit is made by the Charterers, failing the punctual and regular payment of the*
60    *hire, or bank guarantee,* or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
61    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *Time to count from 7 a.m. on the working day*
62    *following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they*
63    *to have the privilege of using vessel at once, such time used to count as hire. See clause 41*
64
65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66    to 2 ½% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67    of such advances.

68    6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may

26.AUG.2008 19:47   8223432110                                    00                          #2382 P.002 /022

direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in Argentina, Brazil and Plate*, where it is customary for similar size, *dimensions and draft* of vessels to safely

69

lie aground *provided on soft mud ground Trading always excluding Necochea.*

70

7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. *No cargo to be loaded on deck Charterers have the privilege of passengers to far as* ~~accommodations allow. Charterers~~

71
72
73

74

~~paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75

~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, *tally, secure and discharge* and trim the cargo at their expense under the supervision and *direction of the Captain, who is to sign Bills of Lading for*

77
78

cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts.

79

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving, particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. *But this provision does not affect Charterer's right to advance any claim or require arbitration under Clause 17 of any dispute regarding the conduct of the Master in prosecution of the voyage and in carrying out the orders and directions of the Charterers*

80
81

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel, and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the rate of $10.00 per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc. Charterers paying ~~at the current rate per meal~~ for all such victualling, *apart from pilots and customs officers all other representations must be expressly authorized by Charterers cash/contra/immed/victualling at a cost of $1,250 per month/pro rata*

82
83
84
85

86

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and the con-

87
88

89

sumption of fuel.

90
91

12. That the Captain shall use diligence in caring for the ventilation of the cargo *Vessel has only natural ventilation/no electric or forced ventilation)*

92

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ............................................................

93
94

~~on giving written notice thereof to the Owners or their Agents ................. days' previous to the expiration of the first named term, or any declared option,~~

95

14. That if required by Charterers, time not to commence before. *See line 18* ............................................................................................

96

~~and have option of relading for return cargo from ........................ ..................... ..................... to ..................... ..................... direct, or until ..................... ..................... ..................... ..................... p.m. Charterers or~~

97

~~their Agents to have the option of tendering this Charter ......................................... ..................... ..................... but not later than ..... p.m. on ..................... ..................... ..................... ..................... ..................... ..................... ..................... to their option of cancelling this Charter .................................................... ..................... ..................... ..................... ..................... ..................... ..................... the day of vessels readiness.~~

98

15. That in the event of the loss of time from deficiency of men, *including strike of Master/Officers and crew* or stores, fire, breakdown or damages to hull, machinery or equipment,

99

grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost,

100
101
102

and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

103

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation *and negligence* throughout this Charter Party, always mutually excepted.

104
105

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

110

106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *New York, London*
108 one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be *members of the London*
*Maritime Arbitrators' Association or otherwise qualified by experience to deal with commercial shipping disputes.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts paid in advance and not earned, and any overpaid hire or excess
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for the Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, ~~according to Rule 1 to 15, inclusive, 17 to 22 inclusive, and Rule F of~~
116 *York Antwerp Rules 1974 in London including latest amendments, 1994, at such port or place in the United States as may be selected by the carrier, and*
~~as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States currency at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted or~~
119 ~~the rate prevailing on the last day of discharge at the port of final discharge of such damaged cargo from the ship. A verage agreement or~~
120 ~~bond and such additional security as may be required by the carrier must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery, Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~

126 ~~In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the~~
128 ~~goods, the shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers, firm not to contribute to General Average.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 of cost replacing same, to be allowed by Owners.

135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137

138

139

140 22. Owners shall maintain the gear f the ship as fitted, providing gear (for all derricks) capable of handling lifts up to  three tons, also
141 providing ropes, falls, slings and blocks if vessel is fitted with derricks capable of handling heavier lifts. Owners are to provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *lights* for
143 night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144 Charterers to have the use of any gear on board the vessel

145 23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during  loading and discharging~~
146 ~~steamer to provide one winchman per hatch to work winches day and night if required. Charterers requested to pay stevedore engineers, winchmen,~~
147 ~~deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the order of the~~
148 ~~port or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for above engines, or engines in her same proportion as time occasioned~~

150  ~~thereby.~~

151  24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152  in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153  etc." in respect of all cargo shipped under this charter to or from the United States of America-it is further subject to the following clauses, both
154  of which are to be included in all bills of lading issued hereunder: See Clause 59

155                                  U.S.A. General Clause Paramount

156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160                                  Both-to-Blame Collision Clause

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~

167  25. The vessel shall not be required to force ice nor to follow ice breakers nor enter any ice-bound port, or any port where lights or light-
168  ships have been or are about to be with-
169  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
170  port or to get out after having completed loading or discharging.
171  26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
172  navigation of the vessel, acts or pilots and/or tugboats, insurance, crew, and all other matters, same as when trading for their own
173  account.
174  27. A commission of 1.25 per cent is payable by the vessel and Owners to Frontline, Seoul + 1.25% to Lightship Chartering A/S + 1.25% to Oak Bulk
175  Carriers Inc. for division
     , on hire earned and paid under this Charter Party, and also upon any continuation or extension of this Charter

174  28. An address commission of ....2 % per cent payable to the Charterers..................................on the hire earned and paid under this Charter,
175

                        Clause No. 29 to No. 97, are deemed to be incorporated in this Charter Party.


THE OWNERS                                                      THE CHARTERERS

For and on behalf of                                           KOREA LINE CORPORATION
OAK MARITIME (UK) LTD

                                                               D. J. LEE
As agents only                                                 TRAMPER TEAM



**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



### 29.    Description Clause

- M/V TBN (HULL CX 4249)
NEWBUILDING CHENGXI SHIPYARD DIAMOND 53 TYPE
DELIVERY 2008
FLAG TO BE ADVISED, ITF INORDER.
53.500 MT DWAT ON 12.60M SSW
GT 32500/NT 17800
LOA 190M BEAM 32.26M
5/5 HOHA
4 X 36 MT CRANES, 4 X 12CBM GRABS
GRAIN CAPA 65700 CBM
ABT 14 KN LDN/BALL ON ABT 31MT IFO380
AUX ENGINES
AT SEA 2.5 MT IFO380 + 0.1 MT MDO
ALL BASIS GOOD WEATHER, SMOOTH SEAS, MAX BF4 AND DOUGLAS SEASTATE 3
AND NO ADVERSE CURRENT
PORT CONSUMPTION TBA
ALL DETAILS 'ABOUT', WITHOUT GUARANTEE AND SUBJECT TO FINAL YARD SPECIFICATION

BUNKER SPECIFICATION: "ISO 8217: 2005 OIL GRADE RMG380 FOR IFO AND ISO 8217: 2005 GRADE DMB
FOR MDO OR UPGRADE LEVEL, AS UPDATED FROM TIME TO TIME, AND ALSO CONFORM TO
REGULATION 14 & 18 OF ANNEX VI OF MARPOL73/78."

- NAME OF HEADOWNERS: CRIMSON MARINE COMPANY, MAJURO, MARSHALL ISLANDS

### 30.
*Stevedores Clause:*
Charterers are not to be responsible for stevedore or other damage to the vessel unless notified to Charterers
or their agents within 48 hours of occurrence, but always before vessel's departing port where such damage
occurred unless hidden damage incurred, in which case said damage to be reported as soon as possible.
Notwithstanding the above, Master to endeavour to secure the admission of liability from the party causing
damage.  Charterers can redeliver the vessel without repairing any stevedore damage incurred during the
currency of the Charter Party provided this doe not affect seaworthiness or trading ability or normal working
of vessel but Charterers undertake to reimburse Owners for actual expenses incurred on stevedore damage
items as identified per on and off hire survey report.

In case of any and all damage(s) affecting the vessel's seaworthiness and / or the safety of the crew and/or
affecting the trading capabilities of the vessel, charterers shall immediately arrange for repairs of such
damage(s) at their expense and the vessel is to remain on hire until such repairs are completed  and if
required passed by the vessel's classification society.

### 31.
Vessel to work day and night if required by Charterers and to supply lights as on board.

### 32.
Owners warrant that the vessel under present Owners has not traded to Cuba.  Vessel under present Owners
is eligible for bunkers in the United States, its territories and possessions, as per present regulations in force.

### 33.
Fumigation required at first loading port on account of the vessel to be done in Owners' time and at their
expenses.  Fumigation required as a result of cargo carried to be for Charterers' account.

### 34.
Owners shall have the liberty of using diesel oil on entering and leaving ports and for manoeuvring in

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



shallow waters.

**35.**
Should the vessel put back while on voyage by reason of an accident or breakdown, the hire shall be suspended for the time lost from the vessel putting back until she again be in the equidistant position and the voyage resumed therefrom.

**36.**
Vessel to be left in seaworthy trim to Master's satisfaction for shifting between berths / ports.

**37.**
*Bunker Clause:*

Bunkers on delivery : to be advised
Bunkers on re-delivery: about same as on delivery but sufficient to reach nearest main bunkering port.

Charterers at the time of delivery shall take over and pay for all bunkers at Platt's published mean price for ifo 380 cst and  distillates current on date of delivery for Shanghai area and Owners at the  time of redelivery, shall take over and pay for all  bunkers at Platt's published mean price for ifo 380 cst and diesel (if no diesel listed, then distillates) current on date of redelivery in the area concerned.

**38.**
Should the vessel be on her voyage towards the port of redelivery at the time when payment/payments of hire is/are due, said payments shall be made for such length of time as Owners or their Agents and Charterers or their Agents may agree upon as the established time necessary to complete the voyage.  Bunkers to be taken over by the vessel and agreed disbursements for Owners' account and any difference shall be refunded by Owners or paid by Charterers as the case may be.

**39.**
In the event of any of the following countries U.S.A., Japan, U.K., Russia., Peoples Republic of China, Italy becoming engaged as an actual participant in a war or warlike operation with one or more of the other named countries, directly affecting the due fulfilment of this Charter, Charterers and owners shall have the right to cancel this Charter party without liability.  If the Charter Party is cancelled such cancellation shall take place at the port of destination after discharge of any cargo on board, but always subject to the provisions of the attached Conwartime 1993 Clause.

**40.**
Charterers to give 20 days approximate notice of redelivery range and 15/10/7/5/3/1 days approximate notice of redelivery port/date.

**41.**
Payment of hire in cash shall mean by bank telegraphic transfer to a bank designated by Owners for credit to Owners.  When there is any failure to make punctual and regular payment due to oversight or negligence or error or omission of  Charterers' employees, bankers or agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 (three) banking working days written or telegraphic notice to rectify the failure and where so rectified the payment shall stand as punctual and regular payment

Hire to be paid to :



- 2 -

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE





Favoring: Crimson Marine Company

Ref.: "Georgiana" - Charter Hire

**42.**
Crew to open and close hatches before and after stevedores work, when and where required and when permitted by shore regulations.

**43.**
In the event that the vessel is delayed or rendered inoperative by strikes, labour stoppage or any other difficulties due to flag, ownership or crew of the vessel, such time lost to be considered as off hire.

**44.**
Daily agreed hire including overtime:

USD 39,000.00 (thirty-nine-thousand US Dollars .00) – with following escalation:

From 1st day upto 365th day
Hire - USD 45,000.- daily including overtime payable 30 days in advance

From 366th day upto 730th day
Hire - USD 42,000.- daily including overtime payable 30 days in advance

from 731st day upto 1,095th day
Hire - USD 30,000.- daily including overtime payable 30 days in advance

Balance period from 1,096th day upto redelivery:
Hire - USD 39,000.- daily including overtime payable 30 days in advance

Final settlement : (USD 39,000 x total duration) - paid hire to be paid to Owners/Charterers as the case may be.

In any case, total duration should be covered by agreed hire of USD 39,000.-.

In case off-hire period happens, hire is applicable at USD 39,000.-.

First hire plus bunkers on delivery cost to be paid within three banking days after delivery and receipt of Owners' invoice by e-mail or fax. Thereafter payable every 30 days in advance.

**45.**
The vessel is guaranteed suitable for grab discharge and without any obstacles in her clear holds with vertical corrugations. It is understood and agreed that the Charterers have the privilege of authorising the use of a bulldozer in vessel's holds subject vessel's tank top strength.

**46.**
*Cargo Exclusions:*
Any cargo not expressly excluded below and of a harmful and/or hazardous, dangerous, injurious or inflammable nature to be loaded only with Owners' written consent and only in accordance with the respective IMO regulations.

- 3 -

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



Nuclear and radioactive cargo waste/material or its products, asphate nuclear, isotopes, and all dangerous, hazardous, injurious, inflammable cargoes, goods/commodities as listed in the latest IMDG code and/or any subsequent modifications/amendments thereof, asbestos, acids, caustic soda, zinc ashes, oil cakes, India coal, bulk borax, cotton seed, ammonium nitrate/ammonium sulphate, arms and ammunitions, asphalt, bitumen or any of its products, bombs, bomb shell, calcium carbide/calcium chloride, cement and/or its products except cement clinker, charcoal, concentrates (however, Owners to consider carrying same on a case by case basis), cotton, copra, creosoted goods, dangerous chemicals, explosives and/or dangerous cargoes, ferro silicon, fishmeal, green delayed petcoke, meat bone meal, granite, marble, direct reduced iron, HBI, hides of any kind hydrochloride, livestock/animals, any kind of logs/mahogany logs, Mississippi coal, motor blocks and metal turnings/shavings/ borings, motor spirits, naphtha, petroleum or its products, pitch (in bulk/drum), pryites, resin, salt, rock salt, salt petre, scrap or scrap of any kind, soda ash. sulphur. tar/bitumen or any of its products and wet hides, expellers of any kind, turpentine, war materials, deck cargoes and all other unlawful commodities.

Canola/rapeseed always permitted, always excluding expellers
Steels always permitted
Steel slabs are allowed but California block stowage always excluded.
Soyabeans, soyabean meal, soyabean meal pellets, corn, wheat, maize and agri products are always allowed.

3 dirty cargoes out of pig iron / bulk cement / cement clinker / scrap / petcoke permitted per annum with applicable protection and softloading clauses.

No limitation of each dirty cargo item, but max 3 dirty cargoes per annum . Charterers allowed one consecutive dirty cargo per annum.

Pig iron to be permitted subject to following conditions:
Cargo to be loaded in not more than 3 cargo holds and always subject to Vessel's tank top strength and stability permitting. Charterers undertake to supply on board, at their expense, dunnage and/or other materials which Master considers necessary to provide safe protection from damage by loading such cargo; Charterers undertake that loading of first layer of pig iron to be released/ lowered as close as possible to tanktop and not to be dumped or dropped during loading so as to provide cushioned flooring for the balance of cargo. In any event, the loading to be carried out under the Master's supervision and to his reasonable satisfaction. During loading, if any dispute arises between Master and Charterers/Shipper, an independent surveyor shall be called upon jointly by Owners/Charterers and his decision shall be final. In case while en route to discharge port, the cargo was found to shift which might affect the safety of the vessel Owners/Master have the right to call at the nearest port for necessary cargo trimming. All time/expenses incurred shall be for Charterers' account and vessel to remain on hire.

Loading of bulk cement:
For loading of bulk cement Owners will arrange with builder to fit two cement feeding hole(780 mm dia) at each cargo hatch cover for closed hatches loading.

Charterers allowed spout loading of bulk cement with open hatches only in PRC and S. Korean ports but no grab discharge at any discharging port and Charterers to be responsible to pay for any environmental / pollution fines and consequential costs due to cement dust.

*Dirty Cargo Protective Clauses:*
Pig iron / bulk cement / cement clinkers / scrap / petcoke not to be loaded consecutively and not to be the last cargo prior to vessel's redelivery.

Petcoke Protective Clause
Charterers' option to carry petcoke under the following conditions :

- 4 -

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



1) Petroleum coke mentioned herein only limited to the type of non-hazardous/non dangerous green delayed type and / or calcined type.

2) If charterers exercise such option, charterers undertake to use holds as less as possible, provided vessel's stability / trim and stress permit.

3) Such cargo to be loaded / stowed / trimmed / discharged strictly according to latest IMO and / or any other latest regulations / rules applicable to such cargo.

4) Should any additional / special wash down of holds before loading be required when loading this cargo is to be recommended / proposed / required by master, charterers undertake to arrange same at their time/ expenses.

5) After discharge charterers to arrange at their expense / time any additional / special materials (including chemical) required to carry out such holds treatment as the master considers it necessary.

6) Any extra expenses resulting therefrom / incurred thereby (such as hold cleaning to master's satisfaction / hold surveys etc) and / or any detention through any of the above causes are for charterers accounts.

Scrap Protective Clause
Charterers' option to carry scrap under the following conditions :

1) Scrap mentioned only limited to shredded scrap including HMS 1 + 2 must be non-oily and always excluding motor blocks, turnings, metal borings and cuttings.

2) If charterers exercise such option, charterers undertake to use holds as less as possible, provided vessel's stability / trim and stress permit.

3) Charterers undertake that loading of the first layer of scrap will not be released until touching tank top and will not be dumped / dropped during loading. first layer of scrap is to be loaded, stowed, trimmed to the satisfaction of the master before loading balance of cargo.

4) Any extra expenses resulting therefrom / incurred thereby (such as hold cleaning to master's satisfaction / hold surveys etc) and / or any detention through any of the above causes are for charterers accounts.

5) Damage to the vessel caused by scrap, the liability of the charterers are to be determined by pre-loading and post-discharging surveys. Such surveys are for charterers account.

Cement / Cement Clinkers Protective Clause

1) Charterers option to cut cement holds for cement loading at the suitable place of hatch cover in accordance with vessel's builder's specification and class approval. all time for preparing, cutting and restoring of cement holes always upto / at master and classification surveyor's supervision, attendance, satisfaction and approval as well as all expenses including classification surveyor's fees and expenses shall be for charterers account .

2) When restoring cement holes, chill plates or similar material if deemed necessary by master/classification surveyor, to be fitted for complete welding in order to reinstate the hatch covers back to their original condition. After completion of restoring of holes, hose test to be carried out in presence of classification surveyor and the test result should be to his satisfaction. Otherwise, the charterers have the obligation to rectify the situation until and when satisfied by surveyors.

3) When loading / discharging cement / cement clinker, charterers undertake to take such precautions, to master's satisfaction, to limit to a minimum, the amount of cement dust likely to affect the vessel's decks,

- 5 -

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29ᵀᴴ FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



cranes, hull and superstructure. in this event, surveys of vessel's condition to be undertaken at charterers time and expenses before loading and after discharging of such cargo. Charterers to undertake to return vessel to similar condition that existed prior to loading as evidenced by survey at their time and expense with shore labour if required, prior to redelivery.

4) After loading, charterers undertake to arrange at their expenses any special / extra trimming and / or levelling of cargo, if required, to master's satisfaction.

5) Charterers are also responsible for the following :
- Bilge well being well protected to make smooth suction, whilst discharging hold-washing water by gum tapes (plaster) or other equipments.
- Wash all holds with fresh water immediately after completion discharge thoroughly remove residues and cement dust in holds to keep holds paint in good condition in charterers' time to master's satisfaction. Fresh water to be for charterers account. Bilge water not to be pumped through ship's bilge lines but to be pumped overboard by submerge pumps supplied by charterers. Crew to perform such cleaning if permitted by local regulations.
- Removal of all cargo solidification due to hold sweating which is impossible to avoid by operation of the ventilation system.

6) Owners / vessel not to be held responsible for failure of hold cleanliness inspection for subsequent cargo as a result of carriage of bulk cement.

**47.**
The vessel shall be equipped with wireless telegraphic and VHF telephone to comply with International Regulations to allow vessel to communicate with land stations. Charterers and supercargo have the right of using vessel's means of communications. See also Clause 82.

**48.**
If the vessel calls at any U.S.A. port for the purpose of loading and/or discharging cargo, vessel's equipment shall comply with present regulations in force. if longshoremen are not permitted to work due to failure of Owners and/or Master and/or Owners' Agent to comply with the aforementioned regulations, and delay and expenses shall be for Owners' account. Vessel to comply with provisions of U.S. Coast Guard Regulations for Federal Water Pollution Central Act, Section 154/155/156 and 33 C.F.R., as amended and any delays to vessel as a result of failure to comply to be for Owners' account.

**49.**
*Weather Routing Clause:*
Throughout the currency of this charter, the charterers may supply a well recognized independent weather bureau advise to the master during voyages specified by the charterers, and the master shall comply with the reporting procedure of the weather bureau. However, the master to have the right to adjust the routes recommended by weather monitoring company in accordance with the weather conditions vessel might encounter enroute. It is always to be master's final decision whether to follow weather routing recommendation subject to the safety of the crew, vessel and cargo. If required, owners/master to submit copies of the ship's log to charterers for all sea passages. In the event of discrepancies, charterers to produce a report to support their claim, charterers' weather routing services report and ship's log to be used to amicably settle a claim. In case of an unresolved performance dispute, the matter is to be referred to the LMAA small claims procedure for a final decision.
No deduction of hire is allowed for any amounts in dispute.

**50.**
It is mutually agreed between Owners and Charterers that Owners of the vessel guarantee that minimum terms and conditions of employment of the crew are now, or will be prior to presentation of the vessel for delivery, and will remain for the period of this Charter Party, covered by a Seaman Union agreement.

**RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE**



**51.**
Charterers to pay Owners a lumpsum of US$5,000 in lieu of hold cleaning on redelivery.

Intermediate cleaning of holds to meet the requirements of next employment if required by charterers to be performed by vessel's crew provided local authorities, weather conditions and time permits. Charterers to provide tools and other materials as per master's requirements. In any even, however, Owners and Vessel are not responsible of vessel fails to pass hold inspections. Charterers to pay USD750 per hold for each cleaning after discharge petcoke and other specified 'dirty' cargoes and USD500 per hold for other cargoes.

**52.**
Cargo claims to be settled according to New York Produce Interclub Agreement of February 1970, as amended May 1984, or any subsequent modification or replacement thereof.

**53.**
Deleted.

**54.**
Deleted.

**55.**
*Draft Survey:*
Owners warrant that vessel has on board capacity plan, hydrostatic curves and tables of displacement, tank calibration and trimming correction tables all sounding tubes to be in good maintenance condition and free from impediments and vessel to have ballast tanks either empty or pressed full and trim to be reduced to minimum and not to exceed trim table corrections. If vessel does not comply with above requirements will to be put off hire until able to perform such survey. Master to keep written record of drainage moisture pumped out/in. If required Master to forward to Charterers upon arrival at unloading port and before start of discharging a statement indicating all records of liquids pumped overboard.

**56.**
*Trading Exclusions:*
Vessel to be employed in lawful trades for the carriage of lawful merchandises only between good safe berths, ports or areas where vessel can safely lie always afloat within Institute Warranty Limits, especially excluding:

Albania, Angola, Russian Pacific ports, Cabinda, Cambodia, Cyprus, Turkish occupied Cyprus, Ecuador, El Salvador, Eritrea, Ethiopia, Georgia (including Abkhazia) Ghana, Guyana, Haiti, Honduras, Iraq, Israel, North Korea, Lebanon, Liberia, Namibia, Nicaragua, Nigeria, Libya, Syria, Sierra Leone, Somalia, Sri Lanka, North and South Yemen (except Aden and Hodeidah which are always allowed), former Yugoslavia except Croatia/Slovenia, Zaire, Zimbabwe, River Amazon west of Manaus, River Orinoco west of Matanzas, River St Lawrence out of season (permitted in season only), Great Lakes, Sea of Azov, any war/warlike zones for which additional insurance premiums are levied by Owners war risk insurers, any United Nations embargo countries/ports. Any ice affected port(s) and/or place(s).

When vessel is calling Yemen, Kuwait and Sudan for discharging, owners are not responsible for shortage and related claims and any expenses and time losses thereby to be for charterers account.

Charterers' option to break IWL against charterers paying additional premium charge as per owners' underwriters invoice but same always subject to owners' prior approval.

Charterers' option, vessel Great Circle sailing navigation only with paying a/p charge as per owners' underwriters invoice but same always subject to owners' prior approval.

- 7 -

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



Vessel may trade to war zones or areas where additional insurance premiums are payable, against Owners' prior consent and Charterers paying additional premiums as per Owner's Underwriters' vouchers.

In case of any breach of above by Charterers, Charterers to be responsible for any/all consequences and/or liabilities resulting/arising therefrom and also from any/all losses/damages sustained by Owners.

**57.**
*Off Hire Period:*
Charterers to have the option to add to original Charter period any off hire period during this Charter Party. Charterers to give at the end of the timecharter period, at least 30 days in advance notice of exercising such options.

**58.**
*Suez/Panama Canal:*
The vessel is adequately fitted (including necessary documents required on board) and suitable for the transit of the Suez or Panama Canal at all times on the maximum permissible draft for this type of vessel should there by any delay for measurements to be taken because of initial transit in canals, same to be for Owners' account.

**59.**
*Bills of Lading:*
If Bills of Lading are issued showing a destination at any time prior to official declaration of discharge port such destination not to constitute a declaration of discharge port(s). If this situation occurs, Owners or their Agents will authorise without delay or reservation, the amendment, addition and/or deletion with regard to destination shown on Bills of Lading, or to the signing of new sets of Bills of Lading. Charterers or their Agents delivering old sets of Bills of Lading to Owners in exchange.

Should Bills of Lading not arrive at discharging port(s) in time, then Owners/ Master to release/discharge the entire cargo without presentation of original Bills, against production of Charterers Letter of Indemnity as per Owners' P & I Club wording, signed by Charterer's only.

The Charterers shall have the option to switch bills of lading at a mutually agreed/appointed agents offices, first set of original bills of lading to be surrendered to appointed agents before second set can be issued and released, subject to Owners approval. All expenses incurred for switching bills of lading are to be for Charterers' account.

Charterers and/or their Agents are hereby authorised by Owners to sign on Master's and/or Owners' behalf Bills of Lading as presented in accordance with Mate's Receipt without prejudice to this Charter Party.

All Bills of Lading issued by the vessel while performing under this Time Charter Party shall contain the following clauses (as attached):

New Both to Blame Collision Clause, New Jason Clause, General Clause Paramount, USA, Canadian Paramount Clause which ever applicable, Conwartime 1993 Clause, P&I Bunkering Deviation Clause as attached, to be deemed incorporated in this Timecharter Party.

**60.**
*Insurance:*
Charterers to have the benefit of any return insurance premium receivable by Owners from underwriters of P and I Club (as and when received) by reason of the vessel being in port for a minimum of 30 days.

War Risk: Normal war risk insurance premium to be for Owners' account. Any additional war risk

- 8 -

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



insurance premium over and above normal war risk insurance and any extra war risk insurance premium and crew war bonus due to trade to be for Charterers' account.

P and I: Owners guarantee that the vessel is entered and shall remain for the duration of this Charter Party in a Protection ad Indemnity Association with normal full cover.

Vessel is covered by: TBA

**61.**
Deleted.

**62.**
Deleted.

**63.**
Owners warrant vessels cargo holds upon arrival at first loading port to be cleaned/dried and in every respect ready to receive Charterers intended cargo, any time lost/direct extra expenses incurred resulting from vessel's failure to pass survey at first loadport to be for Owners account. In case of cargo holds being rejected by surveyor, Owners to immediately make any measures to ensure retendering of Notice of Readiness.

**64.**
In the event of the vessel being boycotted by ITF, or equivalent federation, delayed or rendered inoperative by strikes, labour stoppages or by any other difficulties due to vessel's flag, ownership, crew, terms of employment of Officers or crew, or any other vessel under the same ownership, operation or control, all time lost is to be considered as off-hire and expenses and liabilities incurred thereby to be for Owners' account.

**65.**
*Drydocking Clause:*
Owners will give charterers 3(three) months notice to charterers before dry dock in case owners' intended drydock place Singapore/Japan range, in which case charterers to bring the vessel to 1(one) safe port Singapore/Japan range, port in Charterers' option, incl. Vietnam/East Malaysia/China/Korea/Taiwan/Philippines and she will be off-hire from point of deviation till delivered back to Charterers after dd at an equidistant position or dlosp d/d in charterers' option. Charterers to keep owners well informed of vessel's next employment so as to enable owners to arrange timely vessel's dd and charterers to assist owners by fixing suitable employment.

Apart from the above scheduled dry docking vessel is not to dry dock except in case of emergency or unless mutually agreed between owners and charterers.

**66.**
*Smuggling/Drugs Clause:*
Any delay, expenses and/or fine incurred on account of smuggling/drugs shall be for Owners' account if caused by the Officers and/or crew or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents.

**67.**
Deleted.

**68.**
Deleted.

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



**69.**
*Redelivery Ranges:*
Redelivery on dropping last outward sea pilot one safe port in Charterers' option within following ranges, at any time of day or night, Sundays and Holidays included:

- Aden/PMO/Japan range including PRC, Malaysia, Thailand, Indonesia, Philippines, South Korea
- Skaw/Passero range including UK/Eire
- Boston/Recalada range

**70.**
Deleted.

**71.**
General Average/Arbitration in London English law to apply.

**72.**
*BIMCO Double Banking Clause:*
(a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b)      The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)      Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)      The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e)      The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

**73.**
Deleted.

**74.**
Vessel to comply with all IMO recommendations/regulations for loading, carrying, discharging solid bulk cargoes.

**75.**
Joint on/off hire bunker and condition surveys to be carried out, the cost being equally shared between Owners and Charterers, but the time occupied for on hire survey to be for Owners' account and the time occupied for off hire survey to be for Charterers' account, both instances only actual time lost to count. On hire survey to beheld at delivery port and off hire survey in redelivery port.

**76.**
Any tax levied by any government in respect of cargo or freight is for Charterers' account and any tax in

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



respect of the vessel or vessel's flag or ownership or management is for Owners' account. However, all tonnage tax, harbour dues etc at each port of call during this Charter period are to be for Charterers' account.

**77.**
*U.S. Trade – Unique Bill of Lading Identifier Clause (SCAC):*
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading Identifier as require by the U.S. Customs Regulations (19 CRF Part 4 Section 34.7A) including subsequent changes, amendments of modification thereto, not later than the first port of call.

Non-compliance with the provision of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account.

**78.**
*Superficial Inspection:*
The Charterers shall have the option of holding a superficial inspection at any time of this Charter. The Owners and Master shall give every facility and assistance.

**79.**
*Re-measurement:*
The Charterers have the option to reduce vessel's dead weight subject to Owners' classification society's approval at Charterers time and expense. The Charterers to restore original deadweight before redelivery at Charterers' time and expense.

**80.**
The Owners shall provide any documentation relating to the vessel that maybe required to permit the vessel to trade within the agreed trade limits, including but not limited to deratisation and certificates of Financial Responsibility for Oil Pollution, valid International Tonnage Certificate, Suez and Panama Tonnage Certificates, valid Certificate of Registry and certificates relating to the strength, stability, including grain certificates, and/or service ability of the vessel. The Charterers to advise Owners in advances of special certificates required other than usual trading certificates.

**81.**
GMT to apply on hire calculation. Laycan to be in Local time.

**82.**
Charterers to pay USD 1,250 per month pro rata for cables/victualling/entertainment.

**83.**
*Itinerary Clause:*
At Owners' request, Charterers to provide Owners with the vessel's latest itinerary during the whole Charter period.

**84.**
Fixture to be kept strictly private and confidential.

**85.**
*Oil Pollution:*
Owners are required to establish and maintain financial security for responsibility in respect of oil or other

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



pollution damage as required by any government, including federal, state or municipal or other division or authority there of, to enable the vessel, without penalty or charge, lawful to enter, remain at or leave any port, place, territorial or contiguous waters or any country, state or municipality in performance of this charter without any delay. This obligation shall apply whether or not such requirements have been lawfully imposed by such government or division or authority thereof. Owners shall make and maintain all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the owners' sole expense and owners shall indemnify charterers against all consequences(including loss of time) of any failure or inability to do so.

The above only applies when charterers have provided owners notice in advance with sufficient time for owner to arrange for necessary financial security for responsibility on pollution issue that has been imposed by the government of the calling ports.

**86.**
*Deratting Certificate:*
The vessel to be delivered with valid deratisation or deratisation exemption or ship sanitation control or ship sanitation control exemption certificate on board, and if this does not cover the whole period of this charter and renewal of certificate and sanitary inspection certificate or fumigation is necessary, cost and same and delay of the vessel and any expenses incurred therefrom to be for owners' account, unless caused by ports called or cargoes carried under this charter party.

**87.**
*Gangway Watchmen:*
Expenses for gangway watchman if ordered by master/owners to be for owners' account, if ordered by charterers or required by a port regulations, such expenses to be for charterers ' account.

**88.**
*Owners' Agent:*
Owners to appoint owners' agents to attend to all owners' matters such as general average, dry docking, hospitalization, repatriation of crew, repair, supply of vessel's stores and provisions, etc. Charterers' agents to attend to small matters such as delivery of crew mails supply of fresh water to ship, delivery of cash advance to master at actual cost without charging additional agency fee.

**89.**
*Owners' Disbursement:*
First hire and value of bunker of delivery to be paid within 3 banking days and receipt of relevant invoice in Seoul by e-mail or fax. Charterers are entitled to deduct from last sufficient hire payments estimated owners' disbursement which not to exceed USD500 per port, as well as value of estimated quantity of bunker of re-delivery.

**90.**
*Cargo Gear & Equipment:*
Vessel's cargo gear, all other equipments to comply with the regulations and/or requirements in effect at ports of call and canals and the vessel is at all times in possession of valid up-to-date certificate onboard necessary to comply with such regulations and/or requirements.
A particular reference is made to The United States Department of Labour Safety and Health Regulations set forth in part 3, code of the federal regulations and also all Australian navigation (loading and unloading safety measures) regulations, 1961 or any amendments thereto, and related requirements or recommendations. Although other provisions of this time charter make it the responsibility of owners it is agreed that, should the vessel not meet the regulations and/or requirements, owners to make immediate corrective measures and that actual time thereby lost, any stevedores' standby time but max upto max 1 shift of 8 hours per incident and directly related and proven expenses to be for owners' account.

- 12 -

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29ᵀᴴ FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



**91.**
*Winch Breakdown:*
In the event of breakdown of a crane or cranes by reason of disablement or insufficient power, the hire to be reduced pro-rata for the period of such inefficiency in relation to the number of crane(s) available. Owners to pay in addition the actual proven direct cost of labour either idle or additionally engaged, because of the breakdown. This does not exempt owners from liability for the cost of hiring shore appliances, if required by charterers, in accordance with clause no.23. If shore appliances are hired by owners the hire of the vessel to be paid in full deducting actual time lost by breakdown. however, if the owners at their option to provide a shore crane at their cost, then the time to count in full and vessel shall remain on hire.

**92.**
*Welding Padeyes:*
Charterers' option to weld padeyes on deck/hold at charterers' time/expense and same to be removed prior to redelivery. Owners/vessel not to be responsible for any stowage problem in cargo holds due to charterers' fittings of padeyes in the cargo holds.

**93.**
*Consecutive Off-Hire:*
If vessel is placed off-hire more than 60 consecutive days, charterers have the right to cancel the balance period of this charter upon completion of the concerned voyage and provided that there will be no cargo left on board. This clause does not apply in the case vessel is placed off-hire for dry-docking purposes.

**94.**
*Weathertight Hatch Cover:*
Owners guarantee that vessel's hatch covers are to be weathertight all throughout this charter period and if hatch covers found defective, same to be rectified at owners time/expenses to charterers' satisfaction.

**95.**
*Arbitration:*
For disputes where the total amount claimed by either party does not exceed US Dollars one hundred thousand the arbitration shall be conducted in accordance with the small claims procedure of the London Maritime Arbitration Association.

**96.**
*Steel Loading;*
In case of steel loading owners to appoint p & i surveyors for preloading condition survey and tally at load ports and mate's receipts, bills of lading to be claused, remarks to be inserted as per surveyors' recommendations.
Cost of condition survey and tally fee to be equally shared between charterers/ owners.

In case charterers to load steel slabs, then California block stowage always excluded.

**97.**
If owners choose to sell the vessel to new owners/managers to be subject to charterers' approval before final sales, which not to be unreasonably withheld.

******

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



***BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005***

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).
(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).
(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".
(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

***BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005***

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)    the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the

- 14 -

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



    requirements of any emission control zone; and

(ii)    the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

### ISM Clause
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the Owners' account.

### New Both-To-Blame Collision Clause
If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### Both-To-Blame Collision Clause
"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### General Average and the New Jason Clause
General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply.

### New Jason Clause
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of

RIDER CLAUSES TO CHARTER PARTY
DATED COPENHAGEN, 29TH FEBRUARY, 2008
M/V "GEORGIANA" / KOREA LINE



which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

*U.S.A. Clause Paramount*
This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16th, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent but no further.

*Canadian Clause Paramount*
This Bills of Lading as far as it relates to the Carriage of Goods by Water, shall have effect, subject to the provisions of the Water Carriage of Goods Act 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to the extent, but no further.

*Conwartime 1993*

1.    For the purpose of this Clause, the words:

(a)    "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

(b)    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.    The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.    The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4.    (a)    The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel

- 16 -

**RIDER CLAUSES TO CHARTER PARTY**
**DATED COPENHAGEN, 29TH FEBRUARY, 2008**
**M/V "GEORGIANA" / KOREA LINE**



and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls therefore shall be for their account.

(b)      If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.      If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.      The vessel shall have liberty:
(a)      to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;
(b)      to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(c)      to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d)      to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e)      to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.      If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging port, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8.      If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

***P&I Bunkering Deviation Clause***
The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever, whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this charter and there take oil bunkers in any quantity in the discretion of owners even to the full capacity of fuel tanks, deep tanks and any other compartment in which oil can be carried, whether such amount is or is not required for the chartered voyage.

*****



ADDENDUM NO. 1


To
Charter Party Dated Copenhagen, 29th February, 2008
for
M.V. "GEORGIANA"



It has this day been mutually agreed between Crimson Marine Company as Owners and Korea Line Corporation as Charterers that with reference to Clause 46 of the above Charter Party the first paragraph of the *Dirty Cargo Protective Clauses* to read:


*" Pig iron / bulk cement /cement clinkers /scrap / petcoke not to be loaded more than one consecutive voyage and not to be last cargo prior to vessel's redelivery."*


All other terms, conditions and exceptions of the Charter Party dated Copenhagen, 29th February, 2008  to remain in force.


Copenhagen, 18th September, 2008


THE OWNERS:                    THE CHARTERERS:

*1.* 



**ADDENDUM NO. 2**

**To**
**Charter Party Dated Copenhagen, 29th February, 2008**
**for**
**M.V. "GEORGIANA"**

It has this day been mutually agreed between Crimson Marine Company as Owners and Korea Line Corporation as Charterers that :

*Notwithstanding the stipulation in Clause 44 of the said charter party, with effect from the first hire payment, the daily agreed hire including overtime is at USD39,000.00 (thirty-nine thousand U.S. Dollar) without escalation.*

All other terms, conditions and exceptions of the Charter Party dated Copenhagen, 29th February, 2008 and its addenda to remain in force.

**Copenhagen, 6th November, 2008**

**THE OWNERS:**

_____
Douglas Fong-Chou Chang, Director
On behalf of
Crimson Marine Company

**THE CHARTERERS:**

KOREA LINE CORPORATION

_D. J. Lee_

D. J. LEE
TRAMPER TEAM